INTERNATIONAL TIME RECORDING CO. v. W. H. BUNDY RECORDING CO.

(Circuit Court, N. D. New York. January 6, 1909.)

No. 7,175.

PATENTS (§ 328*) — INVENTION AND INFRINGEMENT — WORKMAN'S TIME RECORDER.

The Bundy patent No. 671,129, for a workman's time-recorder, claims 1 and 4, which in effect claim broadly "means" for insuring the "proper" insertion of the card in the recorder to unlock the actuating mechanism, are void, in view of the prior art. Claim 2, which includes as a specific element a card having a portion cut away to prevent its insertion in any except the proper position, if conceded validity, must be narrowly construed to cover only what is shown and described, and, as so construed, *held* not infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Bill in Equity to Restrain Alleged Infringement of United States Letters Patent, and for an Accounting.

Kerr, Page, Cooper & Hayward, for complainant.
Parsons, Hall & Bodell, for defendant.

RAY, District Judge. The patent in suit, No. 671,129, for workman's time-recorder, was issued to the Bundy Manufacturing Company, of New York, assignee of Willard Le Grand Bundy, April 2, 1901, on application filed October 25, 1899, and is now owned by the complainant company. It contains 26 claims, of which claims 1, 2, and 4 only are in issue here. These read as follows:

"(1) In a recorder adapted to make a record upon a card or other removable record-surface, the combination, with suitable recording mechanism and suitable impression mechanism and means for actuating it, of a lock adapted to prevent the operation of the impression mechanism, and means actuated by the card or other record-surface, when properly inserted in place in the machine, for removing the lock from its locking position to permit the operation of the impression mechanism, whereby the recording mechanism cannot be operated to make an impression until the card or other record-surface has been properly inserted in place to receive the impression.

"(2) In a recorder adapted to make a record upon a card or other removable record-surface, the combination, with suitable recording mechanism and suitable impression mechanism and means for actuating it, of a lock adapted to prevent the operation of the impression mechanism, a card or other removable record-surface having a portion cut away, and means adapted to

------

be struck and actuated by the card or other record-surface only when the latter is properly inserted in the machine with the cut-away portion of the card in its proper position in the card-holder, for removing the lock from its locking position to permit the operation of the impression mechanism, whereby the recording mechanism cannot be operated to make an impression until the card or other record-surface has been properly inserted in place to receive the impression.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"(4) In a time-recorder adapted to make a record upon a card or other removable record-surface, the combination, with suitable time-recording mechanism and means for driving it and suitable impression mechanism and means for actuating it, of a lock adapted to prevent the operation of the impression mechanism, and means, actuated by the card or other record-surface, when properly inserted in place in the machine, for removing the lock from its locking position to permit the operation of the impression mechanism, whereby the recording mechanism cannot be operated to make an impression until the card or other record-surface has been properly inserted in place to receive the impression."

These are combination claims, and claim 1 has (1) in a time-recorder adapted to make a record upon a card or other removable record-surface, (2) the combination with suitable recording mechanism, and (3) suitable impression mechanism, and (4) means for actuating it, (5) of a lock adapted to prevent the operation of the impression mechanism, and (6) means actuated by the card or other record-surface, when properly inserted in place in the machine, for removing the lock from its locking position to permit the operation of the impression mechanism, whereby the recording mechanism cannot be operated to make an impression until the card or other record-surface has been properly inserted in place to receive the impression. Claim 2 adds the card or other removable record-surface having a portion thereof cut away. Here "the means" actuated by the card for removing the lock from its locking position so as to allow the impression mechanism to operate and make an impression is actuated only when the cut-away portion of the card is in its proper position in the card-holder, and this is accomplished only by inserting the card properly in the machine.

It seems to me that claims 1 and 2 are the same, except it may be the cut-away part of the card as a card or other record-surface must be read into the combination of claim 1 to make its operative. It is actuated by the card or other record-surface only, if we would make an impression at all; that is, print the time or anything else. The machine cannot print or record anything unless we have a card or recording-surface upon which to print or make the record, and the means to remove the lock from its locking position so as to permit the operation of the impression mechanism is actuated by this card or other record-surface. True, in claim 2 the cut-away portion of the card must be in its proper position in the holder, but, if it has a cut-away portion and is properly inserted, the cut-away portion will necessarily be in "its proper position." In both claims we have a card necessarily, and in both the card is "properly inserted." Claims 1 and 4 say "in a recorder," while claim 2 says "in a time-recorder adapted," etc. Claim 4 adds to claims 1 and 2 "means for driving" the recording mechanism.

Such a time-recorder was old; suitable recording mechanism was old; suitable impression mechanism and means for actuating it, and a lock adapted to prevent the operation of the impression mechanism, were all old in the art. Even cards or other record-surfaces, actuating the means employed for removing the lock from its locking position so as to permit the operation of the impression mechanism, were old in this art. The difficulty sought to be remedied was that the card or record-surface used by a workman, each having a card, has parallel, horizontal lines, or may have, one for each day of the week, and also perpendicular lines forming spaces headed "in" and "out," so as to record in the proper space and for the correct day the hour and minute of the entrance and departure of the workman. It is important that the card be inserted right end up, and with the right side thereof to the type which do the printing on the card before the lock is removed from the locking position to permit the operation of the impression mechanism, as otherwise, if the workman is careless in inserting his card, there would be no regularity or order in the record, and the "in" record in the morning might be found on one side of the card and the "out" record at noon on the other, and some of the record might be printed right side up and some wrong side up, etc. The object of the combination of the claims was to prevent this, and compel a proper insertion of the card right end up and right side to the type, in order that the impression mechanism should be released at all and any record made. In other words, the locked impression mechanism is neither released nor unlocked, except by the card, and then only when it is inserted right end up and right side to the front, so to speak. It is also essential that it shall be impossible to release the impression mechanism by means of the insertion of the card before the card has reached its proper position in the card-holder. That proper position is one where the day of the week, as, for instance, Tuesday, for which day the record is being made, indicated by the lines on the card, is exactly opposite the printing or impression mechanism when the card has been pushed down to the abutment, the correct position of which is fixed from day to day by the time mechanism of the recorder. When the card is so inserted—that is, "properly inserted" to receive the impression of the type at the proper place—and is pressed down and held down, it will come in contact with the releasing mechanism and actuate it, so as to allow the impression mechanism, when set in motion, to act. The impression mechanism or platen and hammer is actuated by the operator or workman by pressing down upon an independent lever. This lever can be moved only when the card has been pressed down into contact with, and on a level with, the abutment on which the card, in effect, rests when in proper position to be printed upon, so as to unlock the lever, which is done by removing the obstruction to the free movement thereof. It became important in this art, therefore, to provide some "means" which would prevent the card from reaching the abutment on which it rests when the printing impression is to be made thereon, and thereby, or at that time, releasing or unlocking the impression mechanism, unless and until the card was inserted correctly,

in the correct position, properly; that is, right end up, and with the right face and space thereof presented to the type or recording mechanism. This, the complainant says, is accomplished by the device, etc., of the patent in suit. It also says it has a valid patent covering all means for doing this, and as the defendant has done the same thing by its device, although its means are essentially different from anything shown in the patent in suit, it infringes.

The claims of the patent in suit and in issue here are as broad as language can make them. They are not confined in terms to devices shown, illustrated, or described in the specifications. It is conceded that, although this patent was issued more than seven years ago, no machine or recorder embodying the device of the claims in question has ever been made or put upon the market by the patentee or complainant, or by any other person by their authority, or by any other person, firm, or company unless it be the defendant here. This is significant in more than one aspect of this case. The patent says:

"My invention relates to recorders, and particularly to time-recorders adapted to make an impression of the time upon a removable card or other suitable record-surface.

"It has for its object to provide means for preventing the actuation of the impression mechanism until after the card or other removable record-surface has been properly inserted into the machine, and for releasing the impression mechanism when the card or other record-surface has been properly inserted to permit a record to be made upon the card or other record-surface; also for preventing the incomplete operation of the impression mechanism; also for preventing the removal of the card or other record-surface after its insertion into the machine until the impression has been made upon the card or other record-surface; also to provide a new and improved record-card for use in a recorder; also to improve the mechanism by which a clock-movement imparts vertical movement to the card or other record-surface. * * *

"My invention is shown in the drawings in connection with a time-recorder adapted to print an impression of the time of the operation of the machine upon a removable card or other removable record-surface. My invention may be used, however, in some of its aspects in recording-machines other than time-recorders, and in time-recorders varying greatly from the one shown in the drawings. * * *

"14 is the card-holder or receptacle for the card. It is composed of a stationary framework and a movable shelf, 15. Shelf 15 forms the bottom of the card-holder; but the card is never adapted to rest upon it, even when fully and properly inserted into the card-holder, as will be presently explained. This shelf is made movable vertically in the card-holder, and is automatically actuated by the clock-movement at regular stated intervals to bring the different horizontal columns upon the card, when the latter is properly inserted in the card-holder, upon the printing-line, so that the impression will be made upon the horizontal line of the card representing the proper day of the month. * * *

"Any suitable impression mechanism and any suitable mechanism for operating it may be employed. * * *

"In order to prevent the operator from making an impression before his card has been properly inserted into the card-holder, I provide a lock which normally is adapted to prevent the operation of the impression-operating mechanism and means actuated by the card or other record-surface when properly inserted in place for receiving the impression and for removing the lock from its locking position. My improved mechanism for this purpose can be used in any suitable recording or time-recording machine. In the form shown in the drawings I show a locking-lever, 55, which occupies normally a position underneath operating-lever 47, to prevent the depression of that lever and means adapted normally to project into the path of the card as it is inserted into the card-holder and adapted to be struck and moved by the

card to remove the lock from operative position to permit the depressions of lever 47. In the preferred form shown in the drawings, the unlocking means consist of an abutment, 56, which forms one end of a bell-crank lever, 57, pivoted at 58 upon shelf 15. A rod, 59, is connected to the other end of bell-crank lever, 57, and passes through a support, 60, also secured to shelf 15, and engages with a sleeve, 61, which forms the head of the rod, 59. A set-screw, 62, enables sleeve, 61, to be moved one way or the other on rod 59, so as to adjust the length of rod 59 and sleeve 61. The end of part 61 is adapted to rest against a plate, 63. Plate 63 is free to swing horizontally a slight distance on hinges, 64, at the rear of the plate. Locking-lever 55 is pivoted at 65, and has a spring-pressed pin, 66, fitted in a cylindrical chamber, 67, of locking-lever 55. When the abutment, 56, is struck and pressed downward by a card, either through the weight of the card or by the pressure of the workman upon it, rod 59 presses head 61 against plate 63. The latter presses upon spring 66, and through it forces locking-lever 55 to the right, as shown in Fig. 5, withdrawing shelf 68 of locking-lever 55 from beneath operating-lever 47, permitting the operation of that lever by the workman. Spring 69 tends to hold locking-lever 55 in its locking position. I preferably make the surface of lever 55 just below shelf 68 of a bevel shape, as shown at 70, to enable the operating-lever, 47, to force locking-lever 55 farther to the right, if necessary. A notch in an arm, 71, pivoted to locking-lever 55, falls over the top of operating-lever 47, as shown at 72, as lock 55 is thrown to the right for the purpose of holding locking-lever 55 in its inoperative or unlocking position until the workman can grasp and depress lever 47 in order to prevent the return of locking-lever 55 to its locking or operative position before the workman can depress lever 47. * * *

"The card or other removable record-surface may be brought into contact with the means for unlocking lock 55 in any suitable way and by any suitable means. In practice I prefer, however, to cut away a portion of the card, as at 83 (shown in Fig. 7), and so arrange the unlocking means and the cut-away portion of the card that the unlocking means will be struck and actuated by the card or other record-surface only when the latter is inserted in the card-holder with the card facing in the proper direction for receiving the impression. This may be accomplished in many different ways; but I prefer to accomplish it by placing in the path of the card a fixed stop, over which the cut-away portion of the card is adapted to fit when the card is properly inserted to allow the card to reach and strike and actuate the said means for removing the lock. In the form shown, 84 is the fixed stop. It is mounted upon shelf 15, and moves therewith. When the card is inserted with the face of the card shown in Fig. 7 facing the type on the hour and minute recording wheels, the cut-away portion, 83, will fit over stop 84, permitting the card to strike abutment 56 and operate lever 57, as above described, to unlock locking-lever 55 and permit the operation of the impression mechanism. If the card, however, is inserted facing the wrong way, or so that the cut-away portion, 83, will not register with stop 84, a portion of the card not cut away will strike stop 84, and the card will not strike the abutment, 56, or will not move it sufficiently to unlock lever 55. Preferably the cut-away portion is made so that in the position of the parts it will register with abutment 56. * * *

"By means of my invention the workman is prevented from operating the recording mechanism until his card has been properly inserted in place, with the card facing in the right direction and inserted to the full extent to properly receive the impression, and after having once inserted his card he is unable to withdraw it or to return the impression-operating device to its normal position until he has properly operated the machine and made the proper impression upon the card. The shelf can also be manually moved to the proper position without the necessity of taking the mechanism, or part of it, to pieces."

Going to the prior art, we find that Mr. Hillard, complainant's expert, admits that, if the word "properly" be eliminated from claims 1 and 4, such claims would read upon the prior art. This, to me,

seems a concession that all that distinguishes the alleged device of claims 1 and 4 of the patent in suit from the prior art is "means" for compelling the insertion of the card in the card-holder "properly"; that is, right end up, and right side to the printing or impression mechanism. If such means are found in this or analogous arts, claims 1 and 4 are invalid. This patent is not for an improvement in such means, but, as stated, for all such means.

It seems to me that the prior art plainly discloses such means for such purpose, and that the combinations of the claims in suit disclose no new or novel means, no new mode of operation, no new result. The patent in suit adds to an improved time-recorder and to a recorder old devices somewhat changed and improved, perhaps, to adapt them to their new environments, but in no such way or to any such extent as to amount to patentable invention in view of the prior art, or to allow the owner of such patent to shut out all competitors from the use of such devices, especially when they do not copy or follow anything shown, illustrated, or described by the patent. Turning to defendant's Exhibit 12, patent to Charles C. Gale and others, dated July 28, 1891, No. 456,650, for car mileage register, which is nothing more nor less than a recorder, and we find that the object of that device was—

"to provide means whereby the mileage of a railway-car may be automatically indicated and registered, and the indicated mileage may be at any time recorded upon removable record-slips. with such other information as may be desired, * * * while such indicating mechanism is capable of being made at any time to impress upon suitable record-slips introduced and brought in contact therewith the mileage indicated and other desirable information."

A case, A. is shown which answers in every way to the card-receiver of the patent in suit, and—

"space is provided for the insertion into the case, A, of a record-slip of paper, cardboard, or other suitable material."

It is upon this that the record is to be made. On this record-slip, or card—

"numbered or graduated dials. corresponding in size and position to the dials. c, c, are printed on the record-slip, and the location thereon of the punctures or impressions made by the points, d, d, gives the reading of the mileage on the record-slip. K is a block or projection on the frame, C, on which block a type plate containing any desired matter, such as the number of the car, its size, ownership, style, etc., is to be affixed, projecting in the same vertical plane as the points d, d, and consequently impressing the record-slip in the same manner when the cam, g, is revolved."

Also the following is found therein:

"In operating our invention, the procedure is as follows: When first attached to the car, the meter is set with all its dials at zero, or on any determinate number, which is noted. At any time afterward when it is desired to ascertain the mileage of the car, it is only necessary to insert the key, which action withdraws the guard-plate covering the opening, b. Then to insert the record-slip into its recess, turn the key, which causes the cam to force the meter-frame forward and impress upon the record-slip the type-plate and dial-points. Then to reverse the movement, withdraw the record-slip, and finally withdraw the key, allowing the guard-plate and its levers to close all the openings. The location of the marks made on the record-slip by the dial-points indicates the miles the car has run by comparison with

the original setting of the meter or a previous intermediate record of the mileage."

Then comes the following:

"As a means of insuring the correct position of the record-slip when inserted for impression, we prefer to form the same of rectangular form, notched on one edge or one corner, and to form the recess for its reception of the same shape, as shown in Fig. 9, so that the slip cannot be fully inserted in any other than the correct position."

In short we have the record-card or slip, the card-holder case, A, the means for printing the record on the card, and the "means" for insuring the correct or "proper" insertion of the card in the card-holder or case, A. The card is notched on the edge (as in the patent in suit), or at the corner thereof (as in defendant's recorder), and, as the holder has a corresponding formation, the card cannot go into the holder except in the correct position, that is, "properly." With this before him, any mechanic half skilled in the art would have devised the "means" for insuring the placing of the card in the card-holder of these time-recorders, or in recorders, "properly"; would have so arranged the holder that the card would be "properly inserted in place to receive the impression."

In fact, such devices in windows, boxes with sliding covers, mills, etc., are very old, and so well known to mechanics that a court ought to take judicial notice of them. It seems to me impossible to conceive of a mechanic so dull that it would not occur to him that a square or oblong card or record-slip with square corners would not pass—could not pass—a triangular piece of wood or metal placed anywhere in the groove of the card-receiver, apex up and next the frame, but so it could be pushed outwardly, and then by spring fixture resume its place when the pressure was removed, but that the same card would pass the moment you cut a corresponding triangular piece from the corner of the card so it would pass down by the side of the triangular piece in the frame and push it to one side if you inserted the card properly. So if you desire to insure the full entrance of the card into the full depth of the card-receiver when properly inserted, a notch at any point on the end of the card except the center, with a corresponding obstruction to register with it when properly inserted, would insure the desired result, and the obstruction would prevent such full entrance of the card when not properly inserted, as then the obstruction would prevent the entrance of the card to its full depth. Contact of the card, when pressed to its full depth in the holder or receiver, with the means for operating the lock, is a mere matter of mechanical calculation and arrangement, and, in view of the prior art, involved no invention.

But, turning from the Gale patent to the Bundy patent of September 6, 1892, No. 482,293, for workman's time-recorder, we find such a time-recorder, suitable recording mechanism and means for driving it, suitable impression mechanism and means for actuating it, a locked platen and hammer (or, what is the same thing, "impression mechanism"), and means for actuating it, and for both locking and unlocking it, and which means for unlocking are actuated by a check, the full equivalent of a card, which moves in the full equivalent of

the card-guide and receiver called the "check-chute." To insure the proper insertion of this check in the chute or receiver, with the print ing number on the proper side, we have, as the specifications ex-· plicitly declare, a guide-groove in the check and a "short, vertical fin or rib, K, secured on one side of the chute and projecting into it," and "when the check is inserted it" (the fin) "fits into the guide-groove on the back thereof and guides it" (the check), "and also insures the proper insertion of the check with the printing number on the proper side." The prior art mentioned has shown two of the different means for insuring the proper insertion of the card; and, turning again to the specifications of the patent in suit quoted, we find:

> "The card or other removable record-surface may be brought into contact with the means for unlocking lock 55 in any suitable way and by any suitable means. In practice I prefer, however, to cut away a portion of the card, as at 83, shown in Fig. 7, and so arrange the unlocking means and the cut-away portion of the card that the unlocking means will be struck and actuated by the card or other record-surface only when the latter is inserted in the card-holder with the card facing in the proper direction for receiving the impression. This may be accomplished in many different ways; but I prefer to accomplish it by placing in the path of the card a fixed stop," etc.

An old idea is not patentable. The patent in suit shows no new means—no improved means. The patent claims to add any one or all of the old and well-known devices for accomplishing the result stated in a combination of old devices, so that in the end we have a combination of old elements but accomplishing no new result, as is shown by the following from the prior Bundy patent, which fully describes the means for and manner of bringing the card, or, what is the same thing, the check, into contact with the unlocking means, and unlocking the impression mechanism so it will operate, strike, and cause the printing to be accomplished. It matters not in my judgment that the printing was not done in precisely the same way in the prior devices. The following is the quotation from the prior Bundy patent referred to:

> "A slotway, i, is cut in one side of the check-chute, and a pivotally-mounted lever, m, projects through it into the check-chute, so that the edge of the check engages with it and pushes that end down as the check is pushed into the chute, as shown in Fig. 4, and this raises the connecting-rod, m', the lower end of which is connected to the crank-arm, m'', which is secured upon the rock-shaft, n, which is journaled in the frame, n', and the back of the casing, as shown in Fig. 3. The arm, P, is also secured upon said shaft, and upon its upper end carries the impression-platen, r, so that when the connecting-rod m' is pulled up, as aforesaid, it partially rotates the shaft, n, and throws the platen away from the side of the chute, as shown in Fig. 2, and r' is the retracting-spring which gives the impulse to the platen to strike a quick blow to make an impression. Upon the crank, m'', an arm, s, is secured carrying a hammer upon its outer end, and therefore, when the rod, m', is raised, as aforesaid, said hammer is raised away from the bell, s', and the spring, r', causes it to strike a single blow upon the bell. Upon an arm upon the side of the check-chute I pivot a hook, l, the opposite end of which projects into the check-chute, Fig. 10, so that the dropping check strikes it, and, depressing this end, raises the hook, Fig. 5. When the rod, m', is raised, and the arm, s, with it, the hook, l, engages with the pin, 2, upon this arm, Fig. 10, and this holds the platen and hammer in the position shown in Fig. 2. Then, when the check drops and throws up said hook out of its engagement with said

pin, both the platen and hammer are released to make the impression and give the alarm. When the check has thus unlocked the platen and hammer, it rests upon the sliding stop, 3, and the figures, h'', thereon are then in the printing-line. This stop is suitably mounted alongside of the hook, 1, and is provided with a slide-pin, 4, which extends out beyond the edge of the chute, and an arm, 5, secured to the platform, Figs. 1 and 2, is adapted to engage with this pin just as the platen is making an impression, and force said stop back and release the check, which then drops from the chute into a receiver, 6. * * *

"An arm, 15, is secured upon the rod, m', and is raised therewith when the check is inserted, and then, when the rod is retracted, as aforesaid, the end of said arm will engage with a tooth of the star-wheel and rotate it one tooth, and thus through the train of gearing rotate the reel to wind the ribbon thereon from the spool and feed it. A spring-pawl, 16, engages with the teeth of said star-wheel.

"Upon the hammer-bar I mount a spring in such manner that it will bear upon the hook, 1, when it is in engagement with the pin, 2, and hold it in engagement, as shown in Fig. 10. Upon the hammer-bar I also secure a spring, 30, in such manner that when the hammer-arm is raised by the introduction of the check it will come into contact with the check-stop, 3, and force it into position to operate as a stop, as shown in Fig. 5 and also in Fig. 2.

"A spring, 31, is secured upon the check-chute, with its lower end projecting into it in such manner that a check will readily pass it downward; but after it has been sprung out above the check, the latter cannot be withdrawn, then being beyond the control of the workman. This also prevents fraud by a workman and false registering, as could be done without this spring-finger, in that he could attach a wire or cord to the check, drop it down to the printing-point, make the impression from it, and then pull it back out through the top of the chute. An arm, 32, is secured upon the back of the case, and it projects outwardly in such manner that the platen-arm, p, engages with or strikes against it in such a way as to cause said arm, after it has been set and released as aforesaid, to spring forward and strike an impression blow and then rebound and throw the platen away from the printing-line."

As to claims 1 and 4, in view of the prior art, I find no patentable invention. I think the claims are void, and so hold, irrespective of the question of the inoperativeness of the device shown in complainant's patent. While we must, I think, read a card into claims 1 and 4, it is not necessarily the card of claim 2.

As to claim 2, we have the element of a peculiar specific card. Now assume that claims 1 and 4 refer to some other or different card, or any card which will release the impression mechanism when properly inserted and will not when improperly inserted, I am inclined to hold claim 2, narrowly construed to cover what is shown and described, valid. Broadly construed, it is invalid. As to this claim, the defendant's witness, Arthur S. Browne, says:

"In other words, the card with its cut-away portion or notch is functional with the mechanical elements of claim 2 to produce the stated result, by reason of the fact that the cut-away portion registers with the abutment when the card is put in the receiver wrong side out, so that the recording mechanism is not unlocked, and can be unlocked only when the card is put in the receiver properly faced.

"So far as I know, the subject-matter of this claim, including the recited mechanical elements and the card so cut away as to register with the abutment by straddling it so as not to move the abutment when put in wrongly, was new with Bundy, and to this specific extent the subject-matter of claim 2 of the Bundy patent seems to me to possess novelty."

167 F.—22

I think this claim must be confined to what is shown and described.

The means described in the patent in suit, including card, for insuring the insertion of the card "properly," or that it shall be "properly inserted" in order to reach and actuate the unlocking means provided, are as follows: (1) The card-holder consists of a stationary framework with two uprights having slots in which the card moves vertically; (2) in this framework is a vertically-movable shelf connected with and automatically actuated, moved up and down, by the clock-movement at regular stated intervals, to bring the horizontal columns on the card, when inserted, upon the printing-line. The proper or improper insertion of this card has no effect whatever on the movement of this shelf. Its position in the framework is determined absolutely by the clock-movement, except that it may be manipulated by the hand, but not by the hand of the workman, who cannot get at it. If we stop here and provide no means to prevent the free movement of the card when inserted in the framework, it will drop down when inserted and rest on the shelf itself and move with it; (3) to prevent the card from dropping too far down and coming in contact with the so-called "abutment," which forms one end of the lever connection which operates, when pressed upon at this end, to unlock the impression mechanism, and which abutment is marked "56" in Fig. 9 of the drawings, this shelf is provided with a "stop," 84 (Fig. 9), which is mounted on the shelf, attached thereto, and moves with it. This stop is nothing more nor less than a piece of wood or metal attached to and extending above the shelf, so that it prevents the straight-edged card from reaching the shelf. It is an obstruction to the downward progress of such a card. As shown and described, the abutment, 56, is merely one end of a bell crank lever (57), and is pivoted on the movable shelf, 15, so that the abutment itself is at or near the end opposite the end of the shelf to which is attached the "stop." This abutment extends a little above the movable shelf, and substantially as much above it as does the stop, 84, but the stop prevents sufficient pressure on the "abutment" to operate this bell crank lever. When the abutment is pressed upon from above, as by the card, it unlocks the impression mechanism, inasmuch as it moves the other end of the lever and pushes the lock, or locking-lever, 55, from its position under the operating-lever, 47, and permits the operator to push down or up the handle of lever 47, and thus cause the hammer and platen to strike its blow and do the printing. It is self-evident that any card made to fit the space in the frame of the card-holder will reach the stop, 84, and be supported by it and the movable shelf to which it is attached, and also to an extent or slightly by the abutment, 56, upon which it rests lightly, and this of course assists the frame in preventing the card from tilting. It is self-evident that no ordinary card can reach the abutment, 56, and, however hard pushed, press thereon sufficiently to operate it, and hence the card used must be so made or formed as to permit it to go further down in the frame and press upon the abutment, 56, so as to operate the bell crank lever. To permit this, it is only necessary to cut away that part of the card which meets this stop, 84, so as to permit the card to pass further

down and press upon the abutment, 56, located at or near the other side of the frame. Hence we have the cut-away portion of the card, as in the prior art, Figs. 9 and 11, of the Gale patent, No. 456,650, referred to. If the stop, 84, were located next to the left post of the card-holder, we would cut away a corner of the card, as in the Gale patent; but as the stop is at a distance to the right of that part of the frame, we cut out a small part of the card sufficient to allow it to straddle the stop, 84. As stated, the card thus cut away now presses upon the abutment, 56, and releases the lock. It is also self-evident that, in order to have the lines and spaces indicating the days of the week presented to the printing type, we must face the card that way —that is, present the face of the card having those lines to the type, right end up, of course—and that when this is done we have "properly" inserted the card. It is also evident that when the card is thus inserted we must have the cut-away portion of it meet or register with the stop, 84, so as to straddle it and allow the card to pass on and press upon the abutment, 56. Having located the stop in the machine, if we put in an ordinary card properly faced to the type, we determine where the cut-away portion shall be located, and the cut is made to correspond. It is self-evident that if the card is put in wrong end up or wrong face out, the cut-away portion will not register with the stop, 84; that the card cannot reach the abutment, 56, and press upon it, and so release the lock, 55, and allow the movement of the lever which actuates the impression mechanism. If the stop were located midway between the posts or uprights of the frame, it would make no difference which way the card faced, as it would straddle the stop and press the abutment in either event, hence the necessity of placing the stop to one side of the center line of the holder. To further insure the nonoperation of the unlocking mechanism when the card is wrongly inserted, it is wise to have the stop, 84, at the same distance from the left-hand post of the frame as the abutment, 56, is from the right-hand post, as then the cut-away portion of the card when wrongly inserted will register with the abutment, straddle it, and hence there is no possible danger of actuating the unlocking mechanism when the card is improperly inserted—that is, wrong face out—as the card cannot reach the abutment at all. Hence the expression in the specifications, page 4, second column, line 75:

"Preferably the cut-away portion is made so that in the position of the parts it will register with abutment 56."

When properly inserted, the cutaway portion must register with the stop, 84, on the other side of the space between the posts of the frame of the holder; that is, on the side opposite that occupied by abutment 56. It is also self-evident that no card not having a cut-away portion to register with the stop will actuate the abutment, as it cannot reach it. It follows, I think, that the card referred to in claims 1 and 4 must be the same card specified in claim 2, and that claims 1 and 2 are the same and cover precisely the same combination and device.

The witness Browne says that there is novelty in having a card so cut away as to register with the stop when properly inserted and

with the abutment when wrongly inserted; that is, this, and this only, differentiates the patent in suit from the prior art. Concede this, and there is no substantial utility disclosed. The stop keeps the card from the abutment when wrongly inserted, and is all-sufficient for the purpose, as the frame prevents the card from tilting. The registering of the cut-away portion of the card with the abutment is a mere incident and only a preferred construction. No stress is laid upon this feature. However, it is unnecessary to decide that claim 2, narrowly construed to cover this feature, is invalid. It is all-sufficient that defendant does not make, use, or sell any such device or combination. To put this feature of properly facing the card into a recorder or a time-recorder so as to actuate the impression means and the recording mechanism, when and only when the card is properly faced, did not involve invention—required no mental conception amounting to patentable invention. In fact, it was not new or novel, unless it was new or novel to substitute a card for a metal check. To cut a notch in a card so it would straddle an obstruction was not a new idea, and to provide an obstruction or stop to prevent the movement of the card in the holder was no novel idea. A stop for the check, to prevent its passing far enough into the chute to actuate the locking mechanism, was old in the art, shown in the prior Bundy patent. To make the cut register with the stop, and thus insure the proper facing of the card in the holder, was not new or novel; and to keep the card from the abutment required only the affixing of the stop to the shelf—a simple proposition that would occur to any one. But the feature alluded to, that of having a stop, an abutment, and a cut-away card, and of having the cut-away portion register with the stop when properly inserted, and with the abutment when improperly inserted, is it seems, novel, even if not useful.

It is evident that neither claim in issue here includes the stop, 84, unless it is an integral part of the shelf. Claims 1 and 4 do not mention a card-holder, nor do they mention a card as an element of the combination. This stop is no part of a recorder of the kind mentioned as one element of the claims. The stop is no part of the recording mechanism, or of the impression mechanism, or of the means for actuating them, or either of them, as it is a distinct means to prevent their being actuated—to prevent their operation. The stop is not a part of the lock, and clearly not a part of the "means actuated by the card or other record-surface, when properly inserted in place in the machine," as it is not actuated or moved at all, and is not intended to be, except as it moved up and down by the clock-movement at stated intervals as mentioned. The stop, on the contrary, is intended to prevent the card from reaching and actuating the means referred to. The stop is an important mechanical element, but is not included in either claims 1 or 4, and can be read into claim 2 only as a part of the shelf to which it is attached. But the specifications describe the shelf as distinct from the stop. The specifications do not speak of or mention a shelf provided with a stop. If the stop is omitted, the impression mechanism will be actuated by the card, and the recording mechanism brought into play whether the card is properly or improperly inserted, as in such case it will reach and actuate

the abutment and consequently such mechanism. The stop is specifically mentioned and claimed in claim 3, and is considered an independent and essential element thereof. The complainant's expert admits that the stop, 84, must be read into claims 1 and 4 to differentiate them from the prior art. I do not think there is any authority for reading the stop into either claims 1, 2, or 4. I do not think we can import into this claim an essential independent mechanical device or element not mentioned therein for the purpose of making effective the words at the end of claim 2, viz.—

"whereby the recording mechanism cannot be operated to make an impression until the card or other record-surface has been properly inserted in place to receive the impression."

If the means, or elements, mentioned and claimed in the claim itself, fail to accomplish this result, can we import an element from some other claim and add it to the elements of the first claim in order that the combination shall accomplish the result desired or indicated? I think not. And—

"means, adapted to be struck and actuated by the card or other record-surface only when the latter is properly inserted in the machine with the cut-away portion of the card in its proper position in the card-holder, for removing the lock from its locking position to permit the operation of the impression mechanism"—

refers to the abutment as it is "to be struck and actuated," and the expressions "properly inserted" and "cut-away portion in its proper position in the card-holder" do not import the stop into claim 2, as the card is "properly inserted" and the cut-away portion thereof is in "its proper position" whenever the card is faced properly and is inserted right end up.

The defendant's alleged infringing machine has the usual card-receiver with the movable shelf, old in the art, and at one end of the shelf, left hand, made integral with it as cut from the metal and forming a part of it, is a raised triangular piece fitting into the groove of the post of the frame, which of course prevents the card with a straight-end edge and square corners from dropping further down so as to come in contact with the lever which actuates the means for unlocking the impression mechanism. This triangular piece operates precisely as does a ruler or stick set up slanting in a window frame, when open, to prevent the sash coming all the way down to the bottom crosspiece of the frame. The corner of the card is beveled as in the Gale et al. patent referred to. Defendant has followed the Gale patent, as he has the right to do. The fact that such a triangular piece with a beveled card performs the function of compelling the proper facing of the card before it presses upon the abutment is not new, as Gale says, "so that the slip (card) cannot be fully inserted in any other than the correct" (proper) "position." All complainant did was to place a stop to prevent the card from being fully inserted when not in the correct position, and to locate his abutment where it would be pressed upon by the card when fully inserted in the correct position, and then so locate his abutment that the card which straddles the stop when properly inserted would also straddle the

abutment when improperly inserted. It became a mere matter ·of locating his abutment; that is, the end of the bell-shaped lever. Ordinary mechanical skill was fully competent for the undertaking. Defendant's abutment is a long arm with a flange for the card to rest upon, pivoted to the shelf, diagonally so that one end is above the shelf and the other below its upper edge, and here it connects with a perpendicular shaft which connects with a lever which, when moved, unlocks the impression mechanism and permits the workman, by pressing a lever, to print his time on the card. Defendant's card is not cut away to straddle the triangular piece or stop, or so cut as to straddle or refuse to come in contact with the abutment end of the first-mentioned arm. If the triangular stop fails to prevent the ordinary card from coming in contact with the abutment (as we will term it) of defendant's device, then defendant's card comes directly in contact with the abutment. No means are provided for such an emergency.

If there be anything new or novel in complainant's combination, it is absolutely lacking in defendant's alleged infringing device or machine. Defendant's machine is but a reproduction of the prior art. The same is true of complainant's, except in the particular mentioned which is omitted from defendant's. We have no new combination of old elements producing a new or an improved result, or having a new mode of operation.

Infringement is not shown, conceding the validity of claim 2, and the bill is dismissed, with costs.